

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00072-CV

**IN THE INTEREST OF C.M.O.**, a Child

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-PA-01068
Honorable Dick Alcala, Judge Presiding

Opinion by:      Patricia O. Alvarez, Justice

Sitting:         Sandee Bryan Marion, Chief Justice
                 Marialyn Barnard, Justice
                 Patricia O. Alvarez, Justice

Delivered and Filed:  June 24, 2015

AFFIRMED

Appellant L.J. appeals the trial court's order terminating her parental rights to her child

C.M.O.  L.J. asserts the evidence is neither legally nor factually sufficient for the trial court to have

found by clear and convincing evidence that terminating her parental rights is in C.M.O.'s best

interest.  Having reviewed the evidence, we conclude it is both legally and factually sufficient to

support the trial court's order.

## BACKGROUND

L.J. is C.M.O.'s mother.[1]  Before her pregnancy with C.M.O., L.J. already had a history of

drug abuse.  When L.J. found out she was pregnant, she stopped using drugs, quit smoking, and

stopped drinking wine.  But shortly after C.M.O. was born, he (C.M.O.) began living with L.J.'s

---

[1] C.M.O.'s father is J.O.  J.O. did not appeal the order terminating his parental rights to C.M.O.

mother and her husband because L.J. relapsed into drug abuse.  After pleading to a drug-related offense in another county, L.J. was placed on probation.  Over the years of L.J.'s probation, L.J.'s mother and stepfather continued to be the primary caregivers for C.M.O.  In May 2013, L.J.'s mother contacted the Department of Family and Protective Services because, inter alia, L.J. had not contacted her for three weeks.  After a hearing, the trial court appointed the Department as Temporary Managing Conservator of C.M.O. and ordered L.J. to comply with her service plan. The Department began a family service plan for L.J., which she signed.

At the two day bench trial, L.J. was represented by court-appointed counsel.  She participated in the first day of trial on October 21, 2014, but did not appear for the second day of trial on January 21, 2015.  The trial court terminated L.J.'s parental rights, and she appealed.  She asserts the evidence is neither legally nor factually sufficient to support the trial court's order.

### STANDARDS OF REVIEW

If the Department moves to terminate a parent's rights to a child, the Department must prove by clear and convincing evidence that (1) the parent committed one of the grounds for involuntary termination listed in section 161.001(b)(1) of the Family Code, and (2) terminating the parent's rights is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2015); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002).

### A. Legal Sufficiency

When a clear and convincing evidence standard applies, a legal sufficiency review requires a court to "'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d at 266).  If the court "'determines [a] reasonable factfinder could form a firm belief or conviction that the matter that

must be proven is true,'" the evidence is legally sufficient. *See id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

**B.      Factual Sufficiency**

Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *accord In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266; *accord In re H.R.M.*, 209 S.W.3d at 108.

BASES FOR TERMINATION

**A.      L.J.'s Course of Parental Conduct**

The trial court found by clear and convincing evidence that L.J.'s conduct was grounds for termination under subparagraphs (D), (E), and (O) of section 161.001(b)(1).  *See* TEX. FAM. CODE ANN. § 161.001(b)(1).  On appeal, L.J. does not challenge the trial court's statutory grounds findings.

**B.      Best Interest of C.M.O.**

Instead, L.J. challenges the sufficiency of the evidence that terminating her parental rights is in C.M.O.'s best interest.  *See id.* § 161.001(b)(2).  We briefly review the law pertaining to determining the best interest of the child.  The factors a court uses to ascertain the best interest of the child may include the following:

> (A)  the desires of the child;
> (B)  the emotional and physical needs of the child now and in the future;
> (C)  the emotional and physical danger to the child now and in the future;
> (D)  the parental abilities of the individuals seeking custody;
> . . .
> (G)  the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (footnotes omitted); *accord In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (reciting the *Holley* factors).

Applying each standard of review, we examine the evidence pertaining to the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re E.N.C.*, 384 S.W.3d at 807; *In re J.F.C.*, 96 S.W.3d at 284.

EVIDENCE OF BEST INTEREST OF THE CHILD

The two days of trial were separated by three months: the first day of trial was on October 21, 2014; the second day was on January 21, 2015.  Because the second day's testimony includes significant events that occurred between the first and second days of trial, we recite the witness testimony by the date it was given.

**A.      Lou Valdez's Testimony**

Lou Valdez, a Licensed Professional Counselor, testified only on the first day of trial.  He testified to the following facts.

He began counseling C.M.O. in March 2013.  C.M.O. had "abandonment issues as a result of the separation from [L.J.]" and he was acting out in school.  C.M.O. loves L.J., is bonded to her, and their interactions were positive in the three sessions where he observed C.M.O. and L.J. together.  C.M.O. wants to live with L.J. and Valdez believes that would benefit C.M.O.

Valdez acknowledged he did not know "a whole lot" about L.J.'s background, and he did not know how much time C.M.O. had actually lived with L.J.  He admitted that children who are removed from their mother—even a mother who mistreats them—typically "want to go home to mom."  He knew L.J. had a history of drug abuse, but felt she could be rehabilitated, and he recommended that C.M.O. be transitioned to L.J. as his primary care-giver.  He also acknowledged

that C.M.O.'s grandparents were taking good care of C.M.O. and C.M.O. was doing well living with his grandparents.

### B. L.J.'s Testimony

L.J., C.M.O.'s mother, testified only on the first day of trial.

She was working full-time at a new job and she was in training with her employer. She admitted she had a drug problem: she had used methamphetamines and marijuana, and she had sold drugs in 2006, but she denied selling drugs since that time. She insisted that, to protect C.M.O., she was sober during his pregnancy and she did not even drink wine. Shortly after C.M.O.'s birth, she relapsed and was incarcerated. While she was incarcerated, she took "any classes that they offered . . . to work on myself." She related her love for C.M.O., how she had cared for him for six to seven years of his nine years of life, and how it would be in C.M.O.'s best interest to live with her.

However, she admitted that even after C.M.O. was removed because of her drug abuse, she continued to use drugs. While she was on probation, she violated a condition by associating with a man convicted of a felony drug offense. As of the first day of trial, she had been out of the drug rehabilitation halfway house for just two months.

### C. R.M.'s Testimony

R.M. is L.J.'s stepfather; he testified only on the first day of trial.

He has been married to D.M. for 14 years. C.M.O. lives with R.M. and D.M. in their home, and C.M.O. has lived with them for "pretty much [C.M.O.'s] whole life." He estimated that the longest period of time L.J. ever had C.M.O. by herself was "[p]robably about one month." He testified that L.J. admitted using heroin, alcohol, marijuana, and methamphetamines. He added that he and D.M. love C.M.O. and they are willing to continue to care for him.

**D.       Caseworker's Testimony**

Lora Simmons, the Department case worker for L.J., testified on the first day as follows. L.J. completed the majority of the items on her service plan while L.J. was incarcerated in the SAFP (Substance Abuse Felony Punishment) program. L.J. felt like she made progress on her drug issues while she was in SAFPF (SAFP Facility).

On the second day of trial, L.J. was not present, and Simmons testified to the following. When the Department asked Simmons if L.J. knew the second day of trial was set for that day, Simmons responded yes—L.J. knew of the trial date, but had asked "if her [(L.J.'s)] probation being revoked was going to be a topic of the conversation in court." Simmons opined that L.J. did not attend the second day of trial because L.J. was concerned about being arrested for an outstanding bench warrant.

**E.       D.M.'s Testimony**

D.M., L.J.'s mother and C.M.O.'s grandmother, testified on the first day of trial as follows.

L.J. has a history of drug use dating to before her arrest in 2007. In 2005 or 2006, when law enforcement raided L.J.'s home, they found methamphetamines, money, and a notebook with names and quantities of drugs sold. When L.J. was released from jail, she participated in a drug rehabilitation program for about three months, and then began using methamphetamines again. While L.J. was on probation, she tested positive for drugs and was sentenced to SAFPF for six or seven months followed by three months in a halfway house. L.J. will stay clean for a little while, but then relapse into drug use and start selling drugs again. In August of 2013, D.M. "found videos of [L.J.] making meth[amphetamines], pictures of little packets of meth and a lot of money."

D.M. was also concerned by L.J.'s violent boyfriends. D.M. and C.M.O. saw L.J.'s boyfriend beat and threaten to kill L.J. D.M. noted the police were often called to L.J.'s apartment and L.J. was finally evicted because of the underlying issues.

On the second day of trial, D.M. testified again. Approximately one week after the first day of trial, she found a bag of marijuana belonging to L.J. Within another three weeks, L.J. had quit her job and then asked D.M. for money. When L.J. failed to visit C.M.O., D.M. repeatedly asked L.J. to visit C.M.O.: "I have to literally beg her to come to visit." L.J. would promise to visit C.M.O., but L.J. would break her promise, and "it hurt [C.M.O.] a lot."

When D.M. tries to explain to C.M.O. why L.J. is not around, C.M.O. is disappointed and sad: "You should see that little boy's face." Because L.J. is never around, C.M.O. thinks D.M. is "going to do the same thing." Although R.M. is at home, when D.M. leaves home to run errands, C.M.O. runs after her and starts to cry. If she has been gone just one hour, he will text her to say she has been gone a long time. D.M. reassures him, but when she leaves, C.M.O. worries that he will be abandoned.

Contrasting L.J.'s broken promises and recurring family violence with D.M. and R.M.'s consistent, peaceful care, D.M. testified that "[C.M.O.] needs stability. He needs to know that when he comes home after school, that somebody will be there, that somebody—that he will feel safe." D.M. testified that she believes it is in C.M.O.'s best interest to have L.J.'s parental rights terminated.

**L.J.'S PARENTAL RIGHTS**

The trial court heard testimony that L.J. had a multi-year history of drug abuse that included arrest, ordered rehabilitative services, release, and then relapse into using and selling drugs including methamphetamines. *See Holley*, 544 S.W.2d at 372 (factors (B), (C)). Despite the counselor's recommendation at the first day of trial, the trial court could have considered the changed circumstances between the first and second days of trial. It could have believed that L.J.'s quitting her job, relapse into drug use, and failure to make and keep regular visits with C.M.O. showed terminating her parental rights was in C.M.O.'s best interest. *See id.* (factors (B), (C),

(H)). It could have believed that if L.J. regained conservatorship of C.M.O. and again relapsed into drug abuse, her conduct would endanger C.M.O. *See id.* (factors (B), (C), (H)). The court could have reasoned that because L.J. continued to not only relapse into drug use but also into selling drugs, she had not learned the lessons from the classes she took and would continue to put C.M.O.'s physical health and emotional development in danger. *See id.* (factors (B), (C), (H), (I)).

The court could have believed that C.M.O. had some desire to live with L.J., but that his inherent love for his mother was outweighed by her behaviors' risks to him. *See id.* (factors (A), (C)). Finally, the court could also have believed the testimony that allowing D.M. and her husband to adopt C.M.O. was in C.M.O.'s best interest because C.M.O. is bonded to them; they are providing a safe, stable environment for C.M.O. which is enabling him to excel in school; adoption into D.M. and R.M.'s family would protect C.M.O. from L.J.'s history of family violence; and the court could conclude that C.M.O.'s present and future physical health and emotional development would be best protected in their home. *See id.* (factors (B), (C), (D), (G)).

Reviewing the evidence under the two standards, we conclude the trial court could have formed a firm belief or conviction that terminating L.J.'s parental rights to C.M.O. was in C.M.O.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 27. Therefore, we conclude the evidence is legally and factually sufficient to support the trial court's order. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 27.

## CONCLUSION

L.J. does not challenge the trial court's findings that her course of conduct comprises multiple bases to terminate her parental rights. Instead, she argues the evidence is neither legally nor factually sufficient to support the trial court's finding by clear and convincing evidence that terminating her parental rights is in C.M.O.'s best interest.

Having examined the evidence under the applicable standards of review, we conclude the evidence pertaining to the trial court's findings is both legally and factually sufficient for the trial court to have found by clear and convincing evidence that terminating L.J.'s parental rights to C.M.O. was in C.M.O.'s best interest.  Therefore, we affirm the trial court's order.

Patricia O. Alvarez, Justice